IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | |
| | ) | |
| DEANGELO LEE CONTRERAS | ) | 1:24CR5 - 6 |
| TRISTIAN RENE GAMEZ | ) | 1:24CR5 - 7 |
| VICTOR GONZALEZ | ) | 1:24CR5 - 8 |
| JESUS SALAZAR | ) | 1:24CR5 - 9 |
| CRISTIAN VALDEZ | ) | 1:24CR5 - 10 |
| JESUS GERARDO VALDEZ, JR. | ) | 1:24CR5 - 11 |

RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

On January 16, 2024, a federal grand jury for this District returned an indictment charging multiple Defendants, including Deangelo Lee Contreras, Tristian Rene Gamez, Victor Gonzalez, Jesus Salazar, Cristian Valdez, and Jesus Gerardo Valdez, Jr. with one count of conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c) and one count of conspiracy to commit Hobbs Act robbery in violation of 18 U.S.C. § 1951(a). These Defendants were initially arrested in Texas, and after a detention hearing they were ordered released pending trial on conditions of release. However, the Government appealed that determination under 18 U.S.C. § 3145(a), and the District Judge in this District stayed the release decision and ordered that the Defendants remain in custody for appearance in this District and *de novo* review. The District Judge referred the matter to the undersigned to collect additional evidence and make a Recommendation regarding the issue of release or detention. Notably, the prior hearing in Texas did not have the benefit of a full accounting of the Government's evidence and the nature of each Defendant's alleged involvement in the

underlying offenses. Therefore, the Court set the matter for an evidentiary hearing to allow full presentation by the Government. In addition, the Probation Office in this District prepared updated pretrial services reports regarding each Defendant, and the Court considered those reports and the presentation by counsel for each Defendant. The Court sets out here the additional information presented at the hearing. Based on that additional information, and in light of the evidence regarding the involvement of each of these Defendants in a violent home invasion, the Court recommends that the Defendants be detained. Specifically, clear and convincing evidence established that no combination of release conditions would reasonably assure the safety of others and the community.

I. DISCUSSION

In resolving the issue of release or detention, the Court considers the following statutorily-prescribed factors:

(1) the nature and circumstances of the offense charged . . .;

(2) the weight of the evidence against the [defendant];

(3) the history and characteristics of the [defendant] . . .; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release.

18 U.S.C. § 3142(g). "When the district court acts on a motion to revoke or amend a magistrate judge's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions of release." United States v. Stewart, 19 F. App'x 46, 48 (4th Cir. 2001).

2

In the present case, with respect to the nature of the offenses charged against Defendants, the offenses charged are serious, raising significant public safety concerns, as further discussed below. With respect to the weight of the evidence, the weight of the evidence is strong. At the hearing, Defendants were "afforded an opportunity to testify, to present witnesses, to cross-examine witnesses who appear[ed] at the hearing, and to present information by proffer or otherwise." 18 U.S.C. § 3142(f). The United States called (and, through counsel, Defendants cross-examined) FBI Task Force Officer Timothy Thomas of the City of Durham Police Department to testify regarding the charges in the instant case.

Officer Thomas testified regarding an investigation into a conspiracy targeting cryptocurrency that resulted in multiple home invasions: two in Florida, one in Texas, and one in North Carolina. The Defendants in the present proceeding are all alleged to have been involved in the home invasion in Texas. Before setting out the testimony of Officer Thomas in detail, the Court notes that the six Defendants in this proceeding can be divided into two groups: (1) Defendant Gamez and Defendant Salazar, both of whom made statements implicating themselves and the other Defendants in this home invasion, and both of whom contend they served as lookouts outside the home; and (2) the four Defendants alleged to have entered the home: Defendant Contreras (who acted as the leader of the Texas group and the link to the Florida co-conspirators), Defendants Cristian Valdez and Jesus Gerardo Valdez, Jr. (who are brothers), and Defendant Gonzalez (who is alleged to have joined the group late as a friend of Jesus Valdez, Jr.). The evidence also reflects the involvement of two other co-conspirators from Florida: Jarod Seemungal, who oversaw the cryptocurrency and technology issues and made multiple statements to law enforcement implicating each of the present

3

Defendants, and Remy St. Felix, who originally planned and helped coordinate the home invasion.

Officer Thomas testified that the home invasion targeted an individual named Tyrique who lived in Little Elm, Texas, near Dallas. On December 22, 2022, at approximately 8 pm, at least 4 men, armed and wearing masks, entered the residence. At that time, Tyrique's younger brother Jordan, who was age 18 and is autistic, was the only individual home. The men zip-tied Jordan and struck him in the face, leaving him bound and injured on the floor for over 4 hours. Soon after their arrival, Tyrique and his parents returned to the residence, and upon entering the residence encountered 4 or 5 men in masks with firearms. The men restrained and zip-tied Tyrique and his parents, and then took Tyrique to the computer in the bedroom to demand his help in transferring his cryptocurrency to them. According to the victims, the men were masked the entire time so that only their eyes were visible, and the men spoke to one another in Spanish. During the course of the next 4 hours, Tyrique and his mother Dawn were tortured in various ways, including being struck in the face, having knives and forks shoved into their fingernails, and being burned on the arm by a hot iron. In addition, the men put a firearm into Dawn's mouth in attempts to threaten her and Tyrique into compliance. During the efforts to obtain access to Tyrique's computer, the men were on the phone with another individual, later identified as co-conspirator Seemungal, who was talking them through accessing the computer and the cryptocurrency accounts. When the men continued to have difficulty obtaining the cryptocurrency, Seemungal came to the residence to assist. The victims reported that the intensity of the invasion and the violence increased even further after Seemungal's arrival.

Just after midnight, four hours into this ordeal, Tyrique tricked the men by telling them the cryptocurrency information was buried in the backyard. Once in the backyard, Tyrique broke free, jumped a fence, fled, and called 911. The suspects then fled the residence, but before leaving told Dawn that this was not over and they would be back. The suspects were not able to steal any cryptocurrency, but did take $150,000 in cash, a diamond chain and pendant worth $100,000, two Rolex watches worth $30,000 and $15,000 respectively, and a Louis Vuitton bag. A few days after the invasion, Tyrique received a photo message of his brother, Jordan, tied up on the floor during the invasion, which was reasonably understood as a threat. As a result of this event, all of the victims suffered from PTSD, moved to a new residence, and retained armed security out of fear of additional future invasions.

Officer Thomas testified that while the pendant has not been recovered, the chain was located at the home of one of the Florida co-conspirators. The Louis Vuitton bag was recovered at the home of Defendant Gamez. Defendant Gamez was also identified as the individual who picked up Seemungal to bring him to the residence during the home invasion to assist with obtaining access to the computer. Officer Thomas testified that Defendant Gamez made a statement that he knew Seemungal and that the invasion was Seemungal's idea. In the statement, Defendant Gamez also identified Contreras, Cristian Valdez, Jesus Valdez Jr., Gonzalez, and Salazar as the other participants in the home invasion. Defendant Gamez said that his role was surveillance, that he sat in Cristian Valdez's vehicle 1 mile from the residence to alert them if law enforcement arrived, that he went and picked up Seemungal at their Airbnb and brought him to the residence when they were having trouble obtaining access

to the cryptocurrency, and that Salazar gave Seemungal a firearm when Seemungal arrived and went inside the residence.

Officer Thomas testified that Defendant Salazar also made a statement admitting that he was involved in the home invasion. Defendant Salazar said that he stayed in a vehicle during the invasion. He identified Gamez, Cristian Valdez, Jesus Valdez Jr., and Contreras as the other individuals involved. He said that they left the residence with large duffel bags.

According to Officer Thomas, Seemungal also made multiple statements to law enforcement officers. In his first statement in August 2023, Seemungal gave a history of his involvement in the conspiracy and the home invasions in Florida, Texas, and North Carolina. Seemungal said that they targeted Tyrique based on statements and information online indicating that he had a significant amount of money in cryptocurrency. Seemungal identified the Texas robbery crew as Contreras, Cristian Valdez, Jesus Valdez, Jr., "Jesse's friend Victor" (later identified as Gonzalez), Gamez, and Salazar. In a later debriefing in October 2023, Seemungal further addressed their roles and identified Gonzalez and the other individuals based on driver's license photos. Finally, in a recent debriefing in December 2023, Seemungal again identified all the individuals involved, although at that time he did not mention Gonzalez.

In addition to the statements by Seemungal, Gamez, and Salazar, officers obtained cell site data from Defendants' phones. The cell site data confirmed that all the Defendants traveled from their homes in Houston and were together in Dallas in the days leading up to the invasion, and that they were all in the vicinity of the Litle Elm residence on December 21, the night before the invasion, consistent with them conducting surveillance. In addition, the cell site data of the phones for Contreras, Cristian Valdez, Jesus Valdez Jr., Gamez, and Salazar

6

puts them at or near the residence during the period of 8:00 pm until after midnight on December 22, during the home invasion, and then shows them traveling back to Houston. Officer Thomas noted that there are no records for Gonzalez's phone during the time of the home invasion, but records show him coming from Houston to Dallas on December 21, and show him at the residence on December 21, the day before the home invasion, and also show his phone come back on at 2:00 am in Dallas and travel back to Houston, consistent with the other Defendants.

Officer Thomas testified that officers also obtained data from the phone of Remy St. Felix, including text messages reflecting that Contreras and Jesus Valdez, Jr. were directly involved in planning the home invasion. Reports from the co-conspirators also reflect that Contreras and Gamez were involved with the Florida co-conspirators prior to the home invasion. In addition, Officer Thomas testified that officers determined that Contreras had an account that reflected approximately $2 million in cryptocurrency moving through it.

Officer Thomas also provided general background information regarding the conspiracy based on the statements from Seemungal and the records on St. Felix's phone. Officer Thomas noted that Seemungal was one of the leaders of the conspiracy, along with several individuals located in various countries outside of the United States. The individuals met playing video games online. In 2021, Seemungal and the overseas co-conspirators began to engage in cryptocurrency theft involving a "SIM swapping" scheme that included hacking accounts by duplicating phones. Defendant Contreras was involved in the scheme and assisted Seemungal by holding the devices from the SIM swaps. Seemungal admitted that they conducted 100 SIM swaps, most for $10,000 or less but one as high as $3.5 million. The

7

victims of the $3.5 million SIM swap were then targeted in September 2022 for a home invasion and kidnapping to attempt to get passwords and authentication, and the co-conspirators recruited individuals in Florida to help, including St. Felix and co-conspirator Haisel Daily. The Florida co-conspirators engaged in the home invasion in Florida but did not obtain any cryptocurrency, although the victims were beaten and shot at. The co-conspirators then began targeting Tyrique in Little Elm, Texas, based on Tyrique's postings that led them to believe he had $3 to $10 million in cryptocurrency. St. Felix and the Florida co-conspirators took three trips to Little Elm, Texas in the fall of 2020, but were unsuccessful at conducting the home invasion. On the third trip, they were stopped by deputies in Louisiana and attempted to flee but wrecked their vehicle, resulting in St. Felix breaking his leg. Officers recovered four firearms from the vehicle. During these early trips, Defendants Contreras and Cristian Valdez had been involved in the planning as "tech support" but after St. Felix broke his leg, Contreras told the others that his father had done home invasions, and Contreras began leading the Texas planning. Contreras put together the group with Cristain Valdez, Jesus Valdez Jr., Gamez, and Salazer. The group traveled from Houston to Dallas on December 17 and Contreras set up Airbnbs for the group to stay a few miles from Little Elm. Text messages between Contreras, St. Felix, and Jesus Valdez Jr. reflect planning and surveillance regarding where to hide without triggering the doorbell camera, where the dog was located, and when to arrive. On December 21, Gonzalez joined the group after he was brought in by "Jessie". The $150,000 in cash from the residence was divided evenly between the participants, and the chain and pendant were given to the Florida co-conspirators. St. Felix's phone contained images from the home invasion that were sent to him, including

8

pictures showing the victims tied up on the floor, and those photographs were introduced during the hearing. In addition, Seemungal identified Contreras as the individual who burned the victim's arm during the invasion.

Officer Thomas further testified that in April 2023, a few months after the Texas home invasion, the Florida co-conspirators conducted a similar home invasion in North Carolina. For the North Carolina home invasion, Seemungal remained in Florida but was on the phone to assist with obtaining access to the victim's computer to take the cryptocurrency. The Florida co-conspirators forced entry to the home in North Carolina, were armed and wearing masks, and tortured the victims, causing broken ribs and injuries that required stitches. St. Felix was arrested in New York on the way to do another home invasion there, based on planning conversations from his phone.

With respect to the history and characteristics of Defendants, the Court adopted the information in the Pretrial Services Reports regarding the Defendants' backgrounds and potential release plans. However, based on the evidence presented at the hearing, the Court has serious concerns as to the safety of the community, particularly in light of the nature and circumstances of the present alleged offenses involving Defendants conducting an armed home invasion that involved weeks of planning and involved torturing the victims over the course of several hours. Specifically, as to each Defendant, the Court recommends as follows.

- <u>Defendant Contreras</u>

As set out in the Pretrial Services Report, Defendant Contreras does not have any criminal history. His mother came to the hearing and is willing to serve as third party

custodian.[1] She testified that Defendant Contreras pays for half the rent and for the gas bill and internet, and also gives her money for groceries. The Government introduced a social media post of Contreras pictured with cash; Defendant's mother testified that the cash was hers for a medical procedure and that she had allowed him to post the picture, but the Government noted that regardless of the source, the post included a comment by one of the overseas co-conspirators, reflecting Contreras's connection to the group as early as May 2021. Defendant Contreras's mother also acknowledged that she sometimes smells marijuana on Defendant when he comes from a friend's house, but she does not question him because he is an adult. Counsel for Contreras also filed letters signed by over 30 people on his behalf.

The Court notes some concern with the proposed release plan given his mother's reliance on his income and her testimony creating some concern that she would not report violations. Even setting those concerns aside, the Court finds clear and convincing evidence that releasing Defendant would create a significant risk of danger to the community, in light of the nature of the charges and the evidence presented. Specifically, as to Defendant Contreras, the evidence reflects that he participated in international cryptocurrency scheme with Seemungal and the overseas co-conspirators beginning in 2021, involving sophisticated theft of millions of dollars worth of cryptocurrency. The evidence further reflects that he was directly involved in the planning of the home invasion in the fall of 2022, and that he took the lead on the home invasion after St. Felix broke his leg. Text records reflect his involvement

---

[1] At the hearing, counsel for Contreras noted two corrections to the Pretrial Report. First, at the bottom of page 1 [Doc. #58 at 1], there is a reference to "Mirza Lampson" which should be "Esbedy Reyes." Second, in the report from Texas [Doc. #58 at 6], Defendant's employment at Kroger began on February 18, 2019, not February 18, 2023.

10

in the planning, and cell site records place him at the site of the home invasion. In addition, statements by co-conspirators reflect that he was one of the four individuals who went into the residence, armed and masked, and assaulted, restrained, and tortured the victims, and he was specifically identified as the individual who burned the victims with a hot iron.[2] Given the evidence regarding the extent of his involvement, and given the violent nature of the offense and the substantial penalties he is facing, including up to life in prison, the use of a third-party custodian would not be sufficient, and clear and convincing evidence establishes that there are no conditions that would reasonably assure the safety of the community.

- Defendant Gonzalez

As set out in the Pretrial Services Report, the Report from Texas reflects that Defendant Gonzalez does not have any criminal history. Computerized driving records reflect that he has convictions for No Driver's License (2023), Speeding (2017), Bail-Jumping-Failure to Appear (2017), Speeding-School Zone (2017), although the records could not be verified. His uncle and other family members were willing to serve as third-party custodians.[3] Counsel noted that he had a good work history and had worked his way up at his prior job, and counsel proffered letters in support and also noted that 15 to 20 people came to the bond hearing in Texas to show their support for Defendant Gonzalez.

---

[2] At the hearing, the Probation Office noted that in light of the testimony, they were recommending that Defendant Contreras be detained. As to the other Defendants, the Probation Officer noted that if they were released they should be on home incarceration.

[3] At the hearing, counsel for Gonzales noted two corrections to the Pretrial Report. First, counsel noted that as to his proposed release plan [Doc. #68 at 6], he was no longer proposing to live alone in his apartment and instead proposed to live with his uncle, Mr. Jaime Sandoval, and aunt, Ms. Mayra Sandoval, in Houston. Second, he noted that his job at Red Robin is no longer available, but he has another employment option if released.

11

The Court does not have any basis for concern as to Defendant's uncle serving as a third-party custodian, but the Court nevertheless finds clear and convincing evidence that releasing Defendant would create a significant risk of danger to the community, in light of the nature of the charges and the evidence presented. Specifically as to Defendant Gonzalez, the evidence reflects that he was recruited to join the home invasion, that Defendant Seemungal and Defendant Gamez both identified him as being involved, and that cell phone records confirm that he was involved in surveillance and planning the night before the invasion, reflecting premeditated and intentional involvement in this violent offense. In addition, statements by co-conspirators reflect that he was one of the four individuals who went into the residence, armed and masked, and assaulted, restrained, and tortured the victims. Although there are no records for his phone during the period from the home invasion, cell site records show that his phone came back on at 2:00 am after the home invasion, and then traveled from Dallas back to Houston with the other co-conspirators, at least raising the inference that he turned his phone off during the home invasion in an apparent effort to hide his location. Given the evidence regarding the extent of his involvement, and given the violent nature of the offense and the substantial penalties he is facing, including up to life in prison, the use of a third-party custodian would not be sufficient, and clear and convincing evidence establishes that there are no conditions that would reasonably assure the safety of the community.

- Defendant Cristian Valdez

As set out in the Pretrial Services Report, Defendant Cristian Valdez does not have any criminal history. His mother and father were present and were willing to serve as third-party

12

custodians. Counsel noted that Defendant has many family members in Houston, that his father has health issues, and that he is needed to help run the family business and contribute needed financial support.

The Court does not have any basis for concern as to Defendant's parents serving as third-party custodians, although their dependence on his financial support may raise concern that they would not report violations. In addition, Defendant lived with them and worked at the time of the present alleged offenses, and that was not sufficient to deter his involvement in this conduct. Even setting those concerns aside, the Court finds clear and convincing evidence that releasing Defendant would create a significant risk of danger to the community, in light of the nature of the charges and the evidence presented. Specifically as to Defendant Cristian Valdez, the evidence reflects that he was recruited to join the home invasion and began participating early in the planning and traveled to Little Elm a week prior to the invasion to conduct planning and surveillance, reflecting premeditated and intentional involvement in this violent offense, that Defendant Seemungal, Defendant Gamez, and Defendant Salazar all identified him as being involved, that cell phone records confirm that he was at the location of the home invasion on the night of December 22, 2022, and that statements by co-conspirators reflect that he was one of the four individuals who went into the residence, armed and masked, and assaulted, restrained, and tortured the victims. Given the evidence regarding the extent of his involvement, and given the violent nature of the offense and the substantial penalties he is facing, including up to life in prison, the use of a third-party custodian would not be sufficient, and clear and convincing evidence establishes that there are no conditions that would reasonably assure the safety of the community.

- <u>Defendant Jesus Valdez, Jr.</u>

As set out in the Pretrial Services Report, Defendant Jesus Valdez, Jr. does not have any criminal history. Like his brother Cristian, his mother and father were present and were willing to serve as third-party custodians. Counsel noted that, like Cristian, he is needed to help run the family business and contribute needed financial support.

The Court does not have any basis for concern as to Defendant's parents serving as third-party custodians, although, again, their dependence on his financial support may raise concern that they would not report violations. In addition, Defendant lived with them and worked at the time of the present alleged offenses, and that was not sufficient to deter his involvement in this conduct. Even setting those concerns aside, the Court finds clear and convincing evidence that releasing Defendant would create a significant risk of danger to the community, in light of the nature of the charges and the evidence presented. Specifically as to Defendant Jesus Valdez Jr., the evidence reflects that he began participating early in the planning and traveled to Little Elm a week prior to the invasion to conduct planning and surveillance, reflecting premeditated and intentional involvement in this violent offense, and text messages reflect that he was specifically involved with texts regarding the timing of the invasion, the ways to hide from the ring doorbell, and the location of the dog inside. Defendant Seemungal, Defendant Gamez, and Defendant Salazar all identified him as being involved, and cell phone records confirm that he was at the location of the home invasion on the night of December 22, 2022. In addition, statements by co-conspirators reflect that he was one of the four individuals who went into the residence, armed and masked, and assaulted, restrained, and tortured the victims. The evidence also reflects that he recruited Gonzalez to

14

join them the day before the home invasion. Given the evidence regarding the extent of his involvement, and given the violent nature of the offense and the substantial penalties he is facing, including up to life in prison, the use of a third-party custodian would not be sufficient, and clear and convincing evidence establishes that there are no conditions that would reasonably assure the safety of the community.

- Defendant Tristian Gamez

As set out in the Pretrial Services Report, Defendant Tristian Gamez does not have any criminal history. His mother and father were present and were willing to serve as third party custodians.[4] Counsel noted that Defendant Gamez did not want to cause any further distress to his parents and was cooperative and willing to abide by release conditions, with no indication he was a flight risk.

The Court does not have any basis for concern as to Defendant's parents serving as third-party custodians, although there is some concern that Defendant was living with his parents and working at the time of the present offense, but that was not sufficient to deter him from the present alleged offense. The Court also notes that Defendant Gamez is in a different position than the four prior Defendants for two reasons. First, he was cooperative and made a statement regarding his involvement in this offense. Second, at least by his own account, he was involved as a lookout rather than being inside the residence. In light of these distinctions, the Court has given further consideration to the possibility of release conditions as to Defendant Gamez. However, the Court still finds by clear and convincing evidence that

---

[4] Counsel noted one correction to the Pretrial Services Report, specifically that Defendant's father had one arrest reflected in the report [Doc. #61 at 2], but that was the arrest that returned as "no bill for felony assault on a public servant" in the prior check [Doc. #61 at 6].

15

releasing Defendant Gamez would create a significant risk of danger to the community, in light of the nature of the charges and the evidence presented. Specifically as to Defendant Gamez, the evidence is very strong given his own admitted involvement in the offense. In addition, the evidence reflects that he began participating early in the planning and traveled to Little Elm a week prior to the invasion to conduct planning and surveillance, reflecting premeditated and intentional involvement in this violent offense. Cell phone records confirm that he was at the location of the home invasion on the night of December 22, 2022, and even if he did not enter the residence himself, he watched for law enforcement knowing that at least 4 individuals, armed and masked, were inside the residence for over four hours, terrorizing the victims and trying to force them to provide passwords and other information. His presence directly contributed to their ability to carry out the invasion. In addition, Gamez was responsible for going to get Seemungal and bring him to the residence with a firearm to try to force the victims to provide access and information. Even knowing this, Gamez still continued participating and keeping watch. Further, the victims' Louis Vuitton bag was ultimately located in Gamez's residence, reflecting that he received at least some of the items taken. Given the evidence regarding the extent of his involvement, and given the violent nature of the offense and the substantial penalties he is facing, including up to life in prison, the use of a third-party custodian would not be sufficient, and clear and convincing evidence establishes that there are no conditions that would reasonably assure the safety of the community.

- <u>Defendant Jesus Salazar</u>

As set out in the Pretrial Services Report, Defendant Jesus Salazar does not have any criminal history. Defendant Salazar lives with his mother, his fiancé, and his two minor children. His mother is willing to serve as third-party custodian, and she traveled from Texas for the hearing. His counsel noted that Defendant Salazar works as a mechanic and his family needs his financial support. Counsel noted that Defendant Salazar has strong community support, with 27 people present on his behalf at the hearing in Houston, and he has not been in any trouble since this alleged offense.

The Court does not have any basis for concern as to Defendant's mother or fiancé as third-party custodians, although there is some concern that Defendant was living with his family and working at the time of the present offense, but that was not sufficient to deter him from the present alleged offense. The Court notes that Defendant Salazar is like Defendant Gamez and is in a different position than the four prior Defendants for the same two reasons. First, he was cooperative and made a statement regarding his involvement in this offense. Second, at least by his own account, he was involved as a lookout rather than being inside the residence. In light of these distinctions, the Court has given further consideration to the possibility of release conditions as to Defendant Salazar. However, the Court still finds by clear and convincing evidence that releasing Defendant Salazar would create a significant risk of danger to the community, in light of the nature of the charges and the evidence presented. Specifically as to Defendant Salazar, the evidence is very strong given his own admitted involvement in the offense. In addition, the evidence reflects that he began participating early in the planning and traveled to Little Elm a week prior to the invasion to conduct planning

and surveillance, reflecting premeditated and intentional involvement in this violent offense. Cell phone records confirm that he was at the location of the home invasion on the night of December 22, 2022, and even if he did not enter the residence himself, he was armed and acting as a lookout outside the residence, knowing that at least 4 individuals, armed and masked, were inside the residence for over four hours, terrorizing the victims and trying to force them to provide passwords and other information. In addition, when Seemungal came to the residence to try to force the victims to provide access and information, Salazar gave Seemungal a firearm and knew that Seemungal took the weapon and went inside to continue the invasion, but Salazar still continued participating and keeping watch. Given the evidence regarding the extent of his involvement, and given the violent nature of the offense and the substantial penalties he is facing, including up to life in prison, the use of a third-party custodian would not be sufficient, and clear and convincing evidence establishes that there are no conditions that would reasonably assure the safety of the community.

In sum, the Court finds by clear and convincing evidence that no condition or combination of release conditions would reasonably assure the safety of others and the community in light of the nature and circumstances of the offense, the specific involvement by each of these Defendants, and the weight of the evidence. As the Court noted during the hearing, the Defendants have strong family and community support, but the evidence reflects that they were engaged in violent conduct that their family members and community were not aware of and would not have expected, and Defendants engaged in this conduct despite that support and with the ability to successfully hide this conduct from others. In the circumstances, the risk of danger to the community is too great.

The Court has prepared this Recommendation in order to collect and memorialize the evidence presented during the hearing. This Recommendation can be considered by the District Judge, along with the evidence received from the hearing in Texas, in making a *de novo* determination on the question of release or detention.

IT IS THEREFORE RECOMMENDED that the Motion for Detention by the United States be GRANTED and that these Defendants be detained pending disposition of the instant charges pursuant to 18 U.S.C. § 3142(e)(1). Defendants should be committed to the custody of the Attorney General of the United States or his designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. Defendants should be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility should deliver Defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

This, the 20th day of March, 2024.

/s/ Joi Elizabeth Peake
United States Magistrate Judge